# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LISSETTE MONTALVO, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| BANK OF AMERICA CORPORATION, | § | SA-10-CV-0360 XR |
| BAC HOME LOANS SERVICING, LP | § | |
| f/k/a Countrywide Home Loans | § | |
| Servicing, LP, | § | |
| | § | |
| Defendants. | § | |

## ORDER DENYING MOTION TO EXCLUDE PLAINTIFF'S EXPERTS

This order addresses the defendants' motion to exclude plaintiff Lissette Montalvo's expert witnesses.[1] By way of this lawsuit, Montalvo seeks damages she maintains flowed from the breach of the terms of her mortgage and her rights under her deed of trust. Montalvo alleged that her credit was damaged by a wrongful foreclosure, even though the foreclosure was later rescinded. Montalvo designated Gregory Rubiola and Dr. Kenneth Lehrer as experts on her damages. Defendants Bank of America Corporation and BAC Home Loans Servicing seek to exclude testimony by Montalvo's experts. As the proponent of the witnesses, Montalvo must demonstrate

---

[1] Docket entry # 67. I have authority to resolve the motion under 28 U.S.C. § 636(b) and the district judge's order of referral. *See* docket entry # 78.

the admissibility of their testimony.[2]

**Rubiola**. Rubiola originates loans for banks. Montalvo designated Rubiola to opine that she cannot, and will not in the foreseeable future, obtain credit.[3] Rubiola reached his opinions after denying Montalvo's application for a mortgage. The defendants challenge the following opinions from Rubiola's report:

> 1. The reason that Ms. Montalvo was denied a loan was *because her credit report reflected that she had a foreclosure on her home* on November 3, 2009. *With this foreclosure on her record*, Ms. Montalvo is not eligible to receive financing from Fannie Mae or Freddy Mac for 7 years.
>
> 2. Based on Ms. Montalvo's credit scores, in June 2011 she would have qualified for a fixed rate loan at an annual rate of 4 percent *if she did not have a foreclosure on her credit record*.
>
> 3. Since Ms. Montalvo's current loan is at 7.5%, she will pay $133,772.97 more on her loan over the remaining 25 years of her current note. The present value of the difference between the interest rate of Ms. Montalvo's current note, and the interest she could have obtained *but for the foreclosure on her record*, using a discount factor of .5% is $100,391.43.[4]

The defendants maintain Rubiola's opinions are unreliable because Rubiola denied the loan based on a rescinded foreclosure that was not reflected on Montalvo's credit

---

[2]*See Bocanegra v. Vicmar Services*, 320 F.3d 581, 585 (5th Cir. 2003) ("The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are reliable, but need not show that the expert's findings and conclusions are correct.").

[3]Docket entry # 68, ex. A.

[4]Docket entry # 68, ex. C (Rubiola's report) (emphasis added).

2

report.

Rule 702 applies to the testimony of an expert witness. The rule provides the following:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[5]

For an expert to be considered reliable under the rule, the expert must have "knowledge, skill, experience, training or education"[6] that allow the expert to clarify facts at issue which may not be readily apparent to a juror. The defendants do not challenge the "knowledge, skill, experience, training or education" of Montalvo's experts, but instead complain about assumptions underlying the basis of expert opinions.

The defendants asked the court to exclude Rubiola's testimony because there was no foreclosure at the time of the application. The defendants reasoned that although they foreclosed on Montalvo's loan and purchased Montalvo's home at foreclosure sale, the defendants rescinded the foreclosure after Montalvo hired legal counsel. The

---

[5] Fed. R. Evid. 702.

[6] Fed. R. Evid. 702.

3

defendants argued that the foreclosure was never reported to a credit reporting agency and that the recision returned the parties to their respective positions as if no foreclosure sale had occurred. The defendants contended Rubiola's testimony is unreliable because the opinions in his report were based on a non-existent foreclosure. The defendants complained that because Rubiola never talked to Montalvo and never saw her earlier credit reports, Rubiola was unaware of other facts which impacted Montalvo's credit profile and disqualified her from obtaining a loan.

There are several reasons the defendants' challenge fails. First, Rubiola's testimony about why the loan was denied is a fact, rather than an opinion. During his deposition, Rubiola testified that he sent Montalvo a loan application and Montalvo reported the foreclosure on her application. He explained: "I stopped at the point where I saw that she had been foreclosed on and stopped the whole process."[7] He acknowledged that he was mistaken when he stated in his report that Montalvo's credit report reflected the foreclosure,[8] but maintained that his decision would not have

---

[7]Docket entry # 72, ex. A, p. 47 (Rubiola's deposition). *See id.*, p. 48 ("Basically, I was told to try to do a loan app for a client, I got the application back, I looked at it, I read through it and found out she had been foreclosed and I stopped immediately."); *id.*, p. 50 ("I went through the application briefly, saw that she had a foreclosure and there was no way I could help her.").

[8]Docket entry # 73, ex. A, p. 57 (responding to being asked whether the only reference that he saw to foreclosure was on Montalvo's loan application, "That was a mistake on my part.").

4

changed if he had known the foreclosure was rescinded, "[b]ecause she's already checked the box that she has had a foreclosure [on the loan application]."[9]

Mis-stating the source of his knowledge about the foreclosure did not render Rubiola's testimony about why he denied the loan unreliable because Rubiola denied the application based on knowledge of the foreclosure, not on the source of his knowledge of the foreclosure. Rubiola's report contains a mistake, but unless Montalvo offers Rubiola's report as evidence, the reported statement—that the credit report reflected the foreclosure—does not undermine the reliability of testimony about why Rubiola denied the loan application. Knowing his mistake, Rubiola can correctly testify that he denied the loan because Montalvo reported the foreclosure on her loan application. To the extent Montalvo considers Rubiola's testimony helpful to prove damages, the defendants can explore the discrepancy in Rubiola's report through cross-examination.

The defendants also maintain Rubiola's testimony should be excluded because Rubiola assumed Montalvo had a good credit rating prior to the foreclosure, where the evidence shows Montalvo had poor credit rating before the foreclosure. During his deposition, the defendants presented Rubiola with Montalvo's credit report from the time Montalvo applied for the defaulted loan. Rubiola characterized Montalvo's rating

---

[9]Docket entry # 73, ex. A, p. 58.

5

as "fair" and agreed that the score was close to making her ineligible for a loan. Although Rubiola assumed Montalvo had a good credit rating before the foreclosure, he explained that he denied the loan because of the foreclosure, not because of Montalvo's credit report.[10] After comparing Montalvo's credit report shortly before the rescinded foreclosure and the credit report used for the loan application, Rubiola observed the same type of credit delinquencies.[11]

The comparison of Montalvo's credit reports negated Montalvo's testimony that she had a good credit score prior to the foreclosure, but it does not demonstrate the unreliability of Rubiola's assumption. Because responsible lenders do not typically approve loans for borrowers with poor credit scores, it was reasonable for Rubiola to assume Montalvo had a good credit score prior to obtaining her mortgage—the amount of the defaulted loan was $184,568.00. That Montalvo secured the loan with a "fair" score may go more to lending policy than Rubiola's assumption. Had Rubiola's assumption been correct—that Montalvo had a good credit rating—Montalvo likely "would have qualified for a fixed rate loan at an annual rate of 4 percent if she did not have a foreclosure on her credit record."[12] That Montalvo did not have a good credit

---

[10]Docket entry # 72, ex. A, pp. 60 & 65.

[11]Docket entry # 68, ex. A, p. 67.

[12]Docket entry # 68, ex. C.

rating, and was therefore unqualified for refinancing at a lower interest rate, can be explored through cross-examination. To the extent Montalvo finds Rubiola's testimony helpful, Rubiola can testify about the basis of his assumption and whether the erroneous assumption undermines his opinion that Montalvo "would have qualified for a fixed rate loan at an annual rate of 4 percent if she did not have a foreclosure on her credit record."[13]

Finally, the defendants argued that Rubiola's calculation about Montalvo's damages should be excluded because the calculation assumed Montalvo qualified for refinancing at a lower interest rate. The defendants relied on Montalvo's poor credit score when she sought refinancing and Rubiola's acknowledgment that numerous factors other than the rescinded foreclosure contributed to the poor rating. Thus, the defendants argued that the court must exclude Rubiola's testimony about how much more Montalvo must pay in mortgage interest because of the foreclosure.

Rubiola's erroneous assumption that Montalvo qualified for refinancing at a lower rate does not undermine the reliability of the calculation. Borrowers know that they pay less interest at an interest rate of 4% than at an interest rate of 7.5%. To the extent Montalvo finds Rubiola's testimony helpful—knowing the defendants will present evidence showing she did not have a good credit score when she sought

---

[13]Docket entry # 68, ex. C.

refinancing—the defendants can explore the basis of Rubiola's calculation through cross-examination.

**Lehrer**.  Lehrer is an economist who operates an economic and financial services consulting company.  Montalvo designated Lehrer to testify about economic damages flowing from the alleged wrongful foreclosure and the present value of money at different interest rates for available loans.  The first opinion the defendants challenged is the following one:

> 1. [B]ased upon [the defendants' failure] to promptly and properly administer and monitor the mortgage of Ms. Montalvo, Ms. Montalvo has suffered an initial financial loss of **at least** $12,000 plus, costs, interest, fees and other associated expenses often associated with improper actions on the part of a financial institution or their servicing agent.[14]

This opinion adds Lehrer's fee for his report ($1,000) and Montalvo's attorney fees to-date ($11,000) to reach an initial financial loss.  The defendants maintain Lehrer's testimony about initial financial loss is unreliable because Lehrer is unqualified to testify about attorney fees and because Lehrer was uncertain about the source of his information for attorney costs.  These complaints do not effect the reliability of Lehrer's testimony because Montalvo designated her attorney as a witness and because Lehrer did not address the reasonableness of attorney fees.  Lehrer's opinion represents typical initial costs to prosecute a lawsuit: hiring an attorney for legal representation and hiring

---

[14]Docket entry # 68, ex. E, p. 5 (Lehrer's report).

an expert to quantity damages. Lehrer's testimony about initial financial loss is reliable.

The defendants also challenged the following three reported opinions:

2. If the matter at hand had not come into being and Ms. Montalvo still had *her prior significant credit ratings*, then she would have been easily able to refinance her residence in San Antonio, Texas at an interest rate of 4.50%(+/-). With the average life of a mortgage at seven (7) years, then on the $180,000 mortgage (approx.), Ms. Montalvo would have been able to save the average amount…[of $37,800] with her prior, non foreclosure mortgage….[15]

3. [B]ased on [my] credit banking experience…, it will cost the Montalvo Household appropriately 4.0% ADDITIONAL [credit card] interest costs per year for the next seven (7) years [in the amount of $1,400].[16]

4. [B]ased on [my] credit banking experience…, it will cost the Montalvo Household appropriately 4.0% ADDITIONAL…[insurance] costs per year for the next seven (7) years [in the amount of $1,120].[17]

Like Rubiola's opinions, these opinions assume Montalvo had a good credit rating prior to the foreclosure and that she qualified for refinancing at a lower interest rate. The defendants argued that Lehrer's testimony should be excluded as unreliable because Montalvo had a poor good credit rating before the foreclosure and was disqualified from refinancing. The assumption, however, does not render Lehrer's testimony

---

[15]Docket entry # 68, ex. E, pp. 13-14 (emphasis added).

[16]Docket entry # 68, ex. E, p. 14.

[17]Docket entry # 68, ex. E, p. 15.

unreliable.

Lehrer's second opinion addresses costs Montalvo would have saved had she had refinanced her 7.5% mortgage at 4%. Lehrer assumed Montalvo qualified for refinancing. When questioned about the basis of his opinion that Montalvo had a good credit rating before the foreclosure, Lehrer testified that Montalvo told him she had a credit rating of 720 before the foreclosure and 525 after the foreclosure.[18] Had Montalvo had a good credit score when she sought refinancing, "she [likely] would have been easily able to refinance her residence in San Antonio, Texas at an interest rate of 4.50%(+/-)," and thus realized significant savings with a refinanced loan at a lower interest rate. To the extent that Montalvo values Lehrer's opinion, knowing her prior credit reports indicate she may not have qualified for refinancing, Lehrer may testify about the amount Montalvo could have saved with a refinanced loan. The defendants can explore Lehrer's assumption through cross-examination.

The defendants also complained that Lehrer's calculation of savings in mortgage interest does not consider the amortization of Montalvo's present loan,[19] but "simply assumes a $180,000.00 unpaid balance and simply multiplies this amount by 7.5% and

---

[18] Docket entry # 68, ex. F, p. 21-22 (Lehrer's deposition). *See also id.*, pp. 39 (testifying that "I just took her word for it" that she had a score of 720 before the foreclosure and 525 after the foreclosure).

[19] *See* docket entry # 67, pp. 17-18.

10

4.5% and subtract the latter sum from the former sum."[20] Considering the amount of loan, the interest rate, and the nominal amount of principal repaid in the first seven years of a mortgage, the simplification of Lehrer's calculation is not fatal to Lehrer's opinion. Moreover, Lehrer's opinion is stated in terms of approximation and averages.[21]

Lehrer's third opinion addressed additional costs in credit card interest purportedly flowing from wrongful foreclosure. The defendants asked the court to exclude testimony about increased costs in credit card interest because Montalvo does not have a credit card. When questioned about the basis of the opinion, Lehrer testified that Montalvo told him she had a credit card, but stated that he did not review credit card information in reaching his opinion.[22] Lehrer explained that a person with a posted foreclosure would qualify for a credit card at a higher interest rate than a person without the foreclosure.[23] Although the defendants may be correct about whether Montalvo has a credit card, the existence of a credit card does not necessarily

---

[20] Docket entry # 67, p. 17.

[21] *See* docket entry # 68, ex. E, p. 13 (stating "then on the $180,000 mortgage (*approx.*), Ms. Montalvo would have been able to save the *average* amounts denoted below") (emphasis added).

[22] Docket entry # 68, ex. F, p. 47.

[23] Docket entry # 68, ex. F, p. 47.

undermine Lehrer's opinion about the effect of a foreclosure on credit-card interest rates.

Lehrer opined that even if Montalvo does not have a credit card at the present time, she will likely need one in the future.[24] Lehrer explained that Montalvo will pay a higher credit-card interest rate because of the "posting of the house for foreclosure, the foreclosure, the setting aside of the foreclosure, and all the legal documentation that's probably now semi-voluminous that surrounded"[25] the foreclosure. If Montalvo presents evidence that she has a credit card with a higher interest rate than before the foreclosure, or that she requires a credit card in the future, Lehrer's testimony about the consequences of a foreclosure and and increased interest rates would support Montalvo's damages.

Lehrer's fourth opinion addressed increased property insurance costs that Montalvo will purportedly pay as a result of the foreclosure. The defendants asked the court to exclude testimony about increased insurance costs because Lehrer assumed Montalvo suffered a significant decrease in credit scores as a result of the foreclosure and Montalvo has property insurance. The latter reason fails because the assumption is reasonable. Typically, lenders require property insurance as a condition of obtaining a

---

[24]Docket entry # 68, ex. F, pp. 51-52.

[25]Docket entry # 68, ex. F, p. 52.

mortgage. The former reason—the assumption Montalvo suffered a significant decrease in credit scores as a result of the foreclosure—can be explored through cross-examination. Even with a "fair" credit rating before the foreclosure, it is reasonable to assume that a rescinded foreclosure impacts a lender's credit rating.

**Conclusion**. "The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are reliable, but need not show that the expert's findings and conclusions are correct."[26] Although her experts' opinions may be incorrect because of erroneous assumptions, Montalvo has demonstrated the reliability of her experts' conclusions. Consequently, I DENY the defendants' motion to exclude expert witnesses (docket entry # 67).

**SIGNED** on December 19, 2011.

*[signature: Nancy Stein Nowak]*

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[26]*Bocanegra*, 320 F.3d at 585.

13