# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **LISSETTE MONTALVO,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **BANK OF AMERICA CORPORATION,** | § | **SA-10-CV-0360 XR** |
| **BAC HOME LOANS SERVICING, LP** | § | |
| **f/k/a Countrywide Home Loans** | § | |
| **Servicing, LP,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>REPORT AND RECOMMENDATION</u>

**TO:** **Honorable Xavier Rodriguez**
**United States District Judge**

This report and recommendation addresses the defendants' motion for summary judgment.[1]  I have jurisdiction to enter this report and recommendation under 28 U.S.C. § 636(b) pursuant to the district court's order of referral.[2]  After considering the pleadings and the applicable law, I recommend granting the motion.

**Nature of the case.**  This case arose from a scheduled foreclosure sale of plaintiff Lissette Montalvo's home.  On July 25, 2006, Montalvo borrowed $184,568.00 to

---

[1]Docket entry # 47.

[2]Docket entry # 78.

purchase a home.[3]  Montalvo executed a note promising to repay that amount, plus

interest, and a deed of trust granting a first lien against the mortgaged property as

security for her repayment obligation.[4]  The note and deed of trust were later assigned

to defendant BAC Home Loans Servicing, LP (BAC).[5]

About three years later, Montalvo experienced difficulty making her loan

payments and defaulted on the loan.[6]  On July 6, 2009, BAC notified Montalvo that: she

was in default, she had 30 days to cure the default, and BAC would accelerate

repayment of the loan if Montalvo did not cure the default within 30 days.[7]  Montalvo

did not cure the default within 30 days, so on October 7, 2009, BAC notified Montalvo

_____

[3]Docket entry # 47, ex. C-3 (note dated July 25, 2006, for purchase of property at 11334 Oro Canyon, San Antonio, Texas 78254, signed by Lissette Montalvo).

[4]Docket entry # 47, ex. C-4 (deed of trust for $184,568.00, payable by Aug. 1, 2036, providing for acceleration of debt if borrower defaults by failing to pay in full any monthly payment).

[5]Docket entry # 47, ex. A (declaration by Casheena Chaney, BAC litigation specialist, stating that BAC services loan ending in 8640 and referring to Montalvo's loan history for property at 11334 Oro Canyon); *id*., ex. A-2 (assignment of Montalvo's note and deed of trust).

[6]Docket entry # 38, ¶ 4.3 (stating in first amended complaint that in Summer 2009, she had trouble making her loan payments because of her son's illness and asserting that she had family resources to cure any defaults); *id*., ex. A-1 (loan history showing regular payments until April 2009, a payment in November 2009, but no subsequent payments).

[7]Docket entry # 47, ex. C-8 (letter addressed to Montalvo and referencing loan ending in 8640).

that the maturity of her loan had been accelerated and that her home would be sold at a foreclosure sale on November 3, 2009.[8]

Montalvo's home was sold at the scheduled foreclosure sale to BAC.[9] Montalvo then hired an attorney who asked BAC to set aside the foreclosure sale.[10] BAC rescinded the sale. Montalvo made no further payments on the loan. On March 3, 2010, BAC notified Montalvo that loan had been accelerated and the home would be sold at a foreclosure sale on April 6, 2010.[11]

The day before the second scheduled foreclosure sale—on April 5, 2010—Montalvo filed this lawsuit in state court and asked for a temporary restraining order to stop the foreclosure sale.[12] As defendants, Montalvo named BAC and Bank of America Corporation (BOA) (together, the defendants). The state trial court issued an order

---

[8]Docket entry # 37, ex. B-1 (letter dated Oct. 7, 2009, notifying Montalvo about loan acceleration and foreclosure sale to occur on Nov. 3, 2009).

[9]Docket entry # 47, ex. C-13 (substitute trustee's deed reflecting sale on Nov. 3, 2009 to BAC).

[10]Docket entry # 38, ¶ 4.9 (first amended complaint stating that the attorney wrote BAC on Nov. 19, 2009, and asked BAC to set aside the foreclosure).

[11]Docket entry # 47, ex. B-2 (letter dated Mar. 3, 2010, notifying Montalvo about loan acceleration and foreclosure sale to occur on Apr. 6, 2010).

[12]Docket entry # 1 (original petition attached to notice of removal, imaged as attach. 3 in CM/ECF).

restraining the foreclosure sale.[13]  The defendants removed the case to this court on May 7, 2010.[14]  Jurisdiction is based on diversity of citizenship.

**Procedural posture**.  Earlier this year, the district court abated this case to permit the parties to focus on settling this case.  Settlement efforts failed.  The case was set for trial for January 23, 2012.[15]  The trial date was subsequently vacated.[16]

On June 24, 2011, the defendants moved for summary judgment.  The defendants also moved to exclude testimony from Montalvo's expert witnesses[17] and to strike her summary-judgment evidence.[18]  I denied those motions.[19]  In response to the summary-judgment motion, Montalvo sought to filed a second amended complaint.[20]  I denied the request because Montalvo failed to satisfy Rule 16(b)'s good-cause factors.[21]

---

[13]Docket entry # 1 (temporary restraining order attached to notice of removal, imaged as attach. 4 in CM/ECF).

[14]Docket entry # 1.

[15]Docket entry # 76.

[16]Docket entry # 78 (referring various motions to the magistrate judge and vacating trial date).

[17]Docket entry # 67.

[18]Docket entry # 62.

[19]Docket entry #s 81 & 82.

[20]Docket entry # 58.

[21]Docket entry # 79.

With all other matters resolved, the motion for summary judgment is ripe for resolution. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[22]

**Montalvo's claims**. Montalvo's claims are set out in her first amended complaint. In that complaint, Motalvo brought three state causes of action: (1) breach of contract, (2) violation of Texas Deceptive Trade Practices Act (DTPA), and (3) unreasonable collection efforts. The defendants sought summary judgment on all claims. In responding to the defendants' motion, Montalvo "recognize[d] the difficult burden under [her unreasonable-collection-efforts] cause of action"[23] and presented no evidence raising a fact question about whether the defendants' conduct was willful and wanton. In doing so, Montalvo effectively abandoned her unreasonable-collection-efforts claim. The following discussion focuses on the breach-of-contract and DTPA claims.

**Breach of contract**. Montalvo's breach-of-contract claim is based on the following four allegations:

1. The defendant breached an oral agreement to modify the payment

---

[22]Fed. R. Civ. P. 56(a).

[23]Docket entry # 59, ¶ 6.0.

terms of Montalvo's loan.[24]

2.  The defendants breached the deed of trust by declaring Montalvo in default and failing to give her notice of her right to cure.[25]

3.  The defendants breached the terms of Montalvo's loan by violating HUD regulations.[26]

4.  The defendants breached an oral agreement to modify the terms of the note and deed of trust.[27]

**Claim about the alleged agreement to modify the payment terms of the loan**.

Montalvo alleged that, prior to the first foreclosure sale, "BAC told [her] that what she needed to do [to] be in compliance with the Note and avoid acceleration and foreclosure was to make three payment of $1,091.00."[28]  She complained that she made those payments, but was foreclosed upon anyway.  She maintained that "BAC excused [her] non-compliance with the terms of the Note and Deed of Trust by instructing [her] to make payments in the amount that [she] did."[29]

For this allegation to serve as the basis for a breach of contract, Montalvo must

---

[24]Docket entry # 38, ¶ 5.1.

[25]*Id.*, ¶ 5.2.

[26]*Id.*, ¶ 5.3.

[27]*Id.*, ¶ 5.4.

[28]*Id.*, ¶ 5.1.

[29]*Id.*

prove an agreement existed to modify her repayment obligations. To be enforceable, the alleged agreement must comply with the statute of frauds. Otherwise, her claim is barred as a matter of law.

Under Texas's statute of frauds for loan agreements, "[a] loan agreement in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative."[30] "[A] loan agreement includes agreements to 'delay repayment of money' or 'to otherwise extend credit or make a financial accommodation.'"[31] "When a modification encompasses or relates to a matter that must be in writing, the modification is unenforceable unless it is also in writing."[32]

Because Montalvo's loan was for $184,568—an amount greater than $50,000—the loan is governed by the statute of frauds. "The [alleged] oral modification in this case relates to the original loan agreement, which must be in writing because it exceeds $50,000. Thus, the modification is also required to be in writing to comply with the

---

[30]Tex. Bus. & Comm. Code § 26.02(b).

[31]*Deuley v. Chase Home Fin.*, No. H-05-04253, 2006 WL 1155230, at *3 (S.D. Tex. Apr. 26, 2006) (quoting Texas statute of frauds).

[32]*Deuley*, No. H-05-04253, 2006 WL 1155230, at *2. *See Bank of Tex., N.A. v. Gaubert*, 286 S.W.3d 546, 555 (Tex. App.—Dallas 2009, pet. dism'd w.o.j.) (stating that "oral agreements to extend the loan…ordinarily are unenforceable).

statute of frauds."[33]

There is no written agreement permitting Montalvo to make three payments of $1,091 to avoid acceleration and foreclosure. Thus, the agreement about making three payments did not satisfy the statute of frauds. Montalvo though maintained the doctrine of equitable estoppel precludes summary judgment. Montalvo asserted that the doctrine prevents the defendants from taking advantage of her default "when it was their false promise which led to the Plaintiff being in default."[34]

**Equitable esptoppel**. Texas courts have not specified whether equitable exceptions apply to Texas's statute of frauds for loan agreements.[35] Courts that have considered an estoppel defense as an exception to the statute of frauds for a loan agreement have relied on the following legal principles.[36]

> For promissory estoppel to create an exception to the statute of frauds, there must have been a promise to sign a written agreement that had been

---

[33]*Deuley*, No. H-05-04253, 2006 WL 1155230, at *2.

[34]Docket entry # 59, p. 5.

[35]*See Gaubert*, 286 S.W.3d at 554 ("No case has expressly held that the equitable exceptions to the traditional statute of frauds also apply to section 26.02 [(the loan statute of frauds)].").

[36]For courts citing these legal principles, *see George-Baunchand v. Wells Fargo Home Mortg.*, No. H–10–3828, 2011 WL 6250785, at *7 (S.D. Tex. Dec. 14, 2011); *Cade v. BAC Home Loans Servicing*, No. H–10–4224, 2011 WL 2470733, at *6 (S.D. Tex. June 20, 2011); *Wachovia Bank, Nat'l Ass'n v. Schlegel*, No. 3:09-CV-1322-D, 2010 WL 2671316, at *5 (N.D. Tex. June 30, 2010).

prepared and that would satisfy the requirements of the statute of frauds. It is the promise to sign a written agreement or enter into a written agreement that is determinative. Promissory estoppel sufficient to remove a contract from the statute of frauds requires that the promisor agree to sign a document that had already been prepared or "whose wording had been agreed upon" that would satisfy the statute of frauds. A mere promise to prepare a written contract is not sufficient.[37]

Montalvo presented no evidence rasing a fact question about the existence of a written agreement that had been prepared and that would satisfy the requirements of the statute of frauds. In her affidavit, she described various telephone communications with BOA or BAC employees. She attested that, "[t]he only personal contact I had with BOA prior to the acceleration of the Note in the fall of 2009 was the telephone conversations set out [in her affidavit], where BOA told me that I should not make the Note payments in the amount set out in the Note, and that if I made those payments, there would be no foreclosure."[38] Notably, Montalvo did not attest that the defendants promised to sign a written agreement that had been prepared and that would satisfy the requirements of the statute of frauds. Instead, she alleged that, "BAC represented to the Plaintiff that it would forward a written agreement placing the Plaintiff on a permanent loan modification upon verification of financial statements, which BAC would compile

---

[37]*1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 29 (Tex. App.–Houston [14 Dist.] 2005, pet. denied) (citations omitted).

[38]Docket entry # 59, ex. 1, ¶ 10.

and send to the appropriate agency for processing."[39]

Even if Montalvo had included the foregoing statement in her affidavit, it would not raise a fact question because it does not refer to a written agreement that had been prepared. Without evidence of a promise to sign a written agreement that had been prepared and that would satisfy the requirements of the statute of frauds, Montalvo cannot survive summary judgment based on the doctrine of equitable estoppel.[40]

---

[39]Docket entry # 38, ¶ 4.5.

[40]*Accord George-Baunchand*, No. H–10–3828, 2011 WL 6250785, at *7 ("[T]he plaintiff's argument that the promissory estoppel exception to the statute of frauds applies is unpersuasive because there is no evidence that [the defendant bank] promised to sign an existing written loan modification agreement. 'For promissory estoppel to create an exception to the statute of frauds, there must have been a promise to sign a written agreement that had been prepared and that would satisfy the requirements of the statute of frauds.' 'A promise to prepare a written contract is not sufficient. The defendant must have promised to sign a particular agreement which was in writing at the time.' Viewed in the light most favorable to [the plaintiff], the summary judgment evidence does not reveal that [the bank] promised to sign an existing loan modification agreement. The affidavit [the plaintiff] submitted in opposition to the motion for summary judgment does not mention the existence of a written loan modification agreement.") (citations omitted); *In re Harris*, No. 10-39586, 2011 WL 2708691, at *4-5 (Bankr. S.D. Tex. July 11, 2011) ("Promissory estoppel does not apply here because [the debtor] does not allege that [the bank] promised to sign a written agreement. For promissory estoppel to create an exception to the statute of frauds, there must have been a promise to sign an existing written agreement that had already been prepared.…Here,…there was neither an existing written forbearance agreement nor an existing written agreement to cancel the foreclosure proceeding. [The debtor's] states that on September 6, 2010, a [bank] agent told [the debtor] that she would contact their attorneys and inform them that they had agreed to cancel the foreclosure date of September 7, 2010. However, [the debtor] provides no evidence that there was a promise by [the bank] to sign an existing document. A mere promise to prepare a written contract is not sufficient."); *Schlegel*, No. 3:09-CV-1322-D, 2010 WL 2671316, at *5

**Oral extension of time to make payments**.  Montalvo also maintained the agreement to allow her to make three payments of $1,091 falls under a second exception to the statute of frauds—oral extension of time to make payments.[41]  "[T]his exception includes an oral extension of time to make a required payment under the contract, before the time for such payment has expired."[42]  Montalvo argued that BAC's promise to accept three payments of $1,091 in lieu of the payments in arrears falls under this exception.  Texas courts, however, have rejected this argument when applied to Texas's statute of frauds for loan agreements.[43]

**Partial performance**.  Montalvo also maintained the agreement to allow her to

---

("The [borrowers] have not demonstrated any reason why the Texas statute of frauds does not preclude [them] from relying on the alleged oral promises to support their affirmative defenses.…For their promissory estoppel defense to survive the statute of frauds, the [borrowers] must adduce evidence that [the bank] made an oral promise to sign a writing extending the loans…or promised that the statute was satisfied in relation to the new terms.  The [borrowers] only assert that [bank] employees promised that the loans would be extended, not that there was a promise to sign a writing to that effect. The defense therefore cannot survive the statute of frauds.") (citations omitted).

[41]Docket entry # 59, pp. 7-8.

[42]*Triton Commercial Properties v. Norwest Bank Tex., N.A.*, 1 S.W.3d 814, 818 (Tex. App.—Corpus Christi 1999, pet. denied).

[43]*See Gaubert*, 286 S.W.3d at 556 (rejecting the argument and explaining that the loan-agreement statute of frauds is more exacting than the sale-of-land statute of frauds; the statute of frauds for loan agreements "requires any loan agreement by a financial institution, including an agreement to 'delay repayment of money,' is unenforceable unless it is in writing and signed by the party to be bound'").

make three payments of $1,091 falls under a third exception to the statute of frauds—partial performance.[44]

> Under the partial performance exception to the statute of frauds, contracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud. The fraud arises when there is strong evidence establishing the existence of an agreement and its terms, the party acting in reliance on the contract has suffered a substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead the statute, would reap an unearned benefit. The partial performance must be "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." The acts of performance relied upon to take a parol contract out of the statute of frauds must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced; otherwise, they do not tend to prove the existence of the parol agreement relied upon by the plaintiff.[45]

Like promissory estoppel, no Texas court has clearly stated that the partial-performance exception applies to the loan-agreement statute of frauds. The most recent Texas court considering the exception in a case involving a loan agreement noted, "the only case discussing partial performance in the context of [the loan-agreement statute of frauds] concluded the evidence did not raise a fact issue on that exception."[46] Since that observation, no court has applied the partial performance exception to a loan

---

[44]Docket entry # 59, pp. 7-8.

[45]*Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439-40 (Tex. App.–Dallas 2002, pet. denied).

[46]*Gaubert*, 286 S.W.3d at 555.

agreement.[47]

To the extent the exception applies, Montalvo's claim that "[t]here is no other logical reason to make payments in the specific amount she was instructed" is insufficient to raise a fact question precluding summary judgment for the following

---

[47] *See Gellman v. Telular Corp.*, No. 2:07-CV-282-CE, 2010 WL 5173213, at *4 (E.D. Tex. Dec. 14, 2010) (considering partial-performance exception to the statute of frauds in case involving agreement between inventors about a patent); *Preston Explort. Co. v. Chesapeake Energy Corp.*, No. H-08-3341, 2009 WL 6443108, 4 (S.D. Tex. Nov. 3. 2009) (considering partial-performance exception to the statute of frauds in case involving sale of oil and gas leases and citing general statute of frauds); *Cottman Transmission Sys. v. FVLR Enterprises*, 295 S.W.3d 372, 377 (Tex. App.—Dallas 2009, no pet.) (considering partial-performance exception to the statute of frauds in case involving lease agreement and lease rider and citing the Texas property code's statute of frauds for leases of commercial real estate); *Jasik v. Mauricio*, No. 04–10–00520–CV, 2011 WL 3849473, 5 (Tex. App.—San Antonio Aug. 31, 2011) (considering partial-performance exception to the statute of frauds in case involving contract for sale of land); *Howell v. Aspect Res.*, No. 09–10–00349–CV, 2011 WL 4389560, at *3 (Tex. App.—Beaumont Sept. 22, 2011, pet. filed) (considering partial-performance exception to the statute of frauds in case involving agreement about mineral interests and oil and gas leases and citing general statute of frauds); *Resendez v. Maloney*, No. 01-08-00954-CV, 2010 WL 5395674, at *6 (Tex. App.—Hous. [1st Dist.] Dec. 30, 2010, pet. denied) (considering partial-performance exception to the statute of frauds in case involving alleged ten-year agreement to promote entertainment events and citing general statute of frauds); *Unique Staff Leasing, LLC v. Onder*, No. 13–09–00213–CV, 2010 WL 5621289, at *13 (Tex. App.—Corpus Christi Dec. 9, 2010) (considering partial-performance exception to the statute of frauds in case involving "Independent Contractor and Commission Agreement" and citing general statute of frauds); *Davis v. Sysco Food Services of Austin*, No. 03-08-00593-CV, 2009 WL 4458600, at *2 (Tex. App.—Austin Dec. 4, 2009) (considering partial-performance exception to the statute of frauds in case involving lease agreement for restaurant equipment and citing general statute of frauds); *Campbell v. Northwestern Res. Co.*, No. No. 10-08-00283-CV, 2009 WL 3646085, at *2 (Tex. App.—Waco Nov. 4, 2009, no pet.) (considering partial-performance exception to the statute of frauds in case involving a coal lease subject to the general statute of frauds).

reasons.  The summary-judgment record contains no evidence of virtual fraud.  No

evidence exists that Montalvo suffered substantial detriment for which she has no

adequate remedy.  Although Montalvo maintains she has always had the family

resources to make her payments, this case flowed from the failure to make loan

payments.  Making payments in the amount of $1,091 is consistent with Montalvo's

allegations, but it is also consistent with merely making partial payments.  As such,

making those payments could have been done with some design other than to fulfill the

alleged oral agreement.

**Claim based on the declaration of default and foreclosure**.  In support of her

claim that the defendants breached the loan contract by declaring default, Montalvo

contended the defendants "breached the terms of the Note and Deed of Trust by

declaring a default in the payment when no default occurred, and by failing to give

adequate notice to allow the Plaintiff to exercise her right to cure any defaults.[48]  The

summary-judgment record disproves this allegation.  The summary-judgment record

includes notice of default and the right to cure.[49]  In addition, Montalvo knew she had

defaulted when she contacted the defendants about modifying her loan.[50]

---

[48]Docket entry # 38, ¶ 5.2.

[49]Docket entry # 47, ex. C-8 & C-9.

[50]Docket entry # 59, ex. 1, ¶ 2 (attesting that she had family resources to cure her
default when she first contacted the defendants about her loan during Summer 2009).

**Alleged breach of contract based on violating HUD regulations**. Montalvo also alleged that BAC breached the deed of trust by failing to comply with HUD regulation 24 C.F.R. § 201.50.30 by failing to meet with her face-to-face before foreclosing on her home. The regulation does not apply to Montalvo's loan because it applies to manufactured homes. Presumably, Montalvo intended to rely on 24 C.F.R. § 203.604.

Similar to section 201.50.30, section 203.604 requires the "mortgagee [to] have a face-to-face interview with the mortgagor, or make a reasonable effort to arrange such a meeting…."[51] Montalvo sought to amend her complaint to cite section 203.604, but I denied the request because Montalvo failed to satisfy the good-cause factors. But even if Montalvo had cited the proper regulatory provision in her complaint, the claim cannot survive summary judgment.

Section 203.604 anticipates a face-to-face meeting, but the provision has an exception. The exception provides that a face-to-face meeting is not required if "[t]he mortgaged property is not within 200 miles of the mortgagee, its servicer, or a branch office of either…."[52] The defendants presented summary-judgment evidence that the lender "did not operate a servicing center within a 200-mile radius [of the mortgaged

---

[51]24 C.F.R. § 203.604(b).

[52]24 C.F.R. § 203.604(c)(2).

property] that was staffed with employees familiar with servicing issues…."[53] This evidence shows the exception applies. Thus, the defendants are entitled to summary judgment on Montalvo's claim based on the violation of HUD regulations.

**Alleged breach of contract based on oral agreement to modify the terms of note and deed of trust**. Montalvo's final allegation in support of her breach-of-contract claim is that the defendants breached their agreement "that if the Plaintiff made three payments of $1,091.00 and submitted appropriate paperwork, BAC would induce BoA to modify the Loan in accordance with the terms and conditions of such modifications under [the Home Affordable Modification Program or HAMP]."[54] Montalvo complained that even though she performed her part of the agreement, and the defendants performed part of the agreement, the defendants breached the agreement by accelerating the note and foreclosing on her home.[55] Because she lost the opportunity to modify her loan under the HAMP, Montalvo asked for equitable relief. She asked the court to: order the defendants to reinstate the note, enjoin the defendants from foreclosing, and offset the loan-principal amount due on the reinstated note by damages caused by the breach.

Because this allegation relied on the alleged oral agreement to modify the loan,

---

[53]Docket entry # 64, ex. 2, ¶ 4.

[54]Docket entry # 38, ¶ 5.4.

[55]*Id*.

the claim must satisfy the statute of frauds and fails for the reasons discussed above.

Even if Montalvo raised a fact question about the claim, Montalvo identified no specific

terms of the agreement.[56] The court cannot equitably enforce the alleged oral agreement

because the agreement lacks enforceable terms. In the absence of a fact question, and

enforceability, the defendants are entitled to summary judgment on the claim that they

breached an oral agreement to modify the note and the deed of trust.

**Montalvo's DTPA claim.** In the last cause of action, Montalvo alleged that the

defendants violated various provisions of the Texas DTPA. This claim flowed from

Montalvo's efforts "to participate in HAMP or other programs offered by the

government pursuant to TARP."[57] The HAMP was "designed to reduce mortgage

payments permanently to affordable levels for qualifying homeowners."[58] The HAMP is

a program available under the Troubled Asset Relief Program or TARP.[59] The TARP

---

[56]Docket entry # 47, ex. C, pp. 103 (testifying that the defendant promised to review her documents); p. 104 (in response to question about specific terms of the agreement, answering "I never spoke to my representative"); p. 105 ( in response to question about agreed interest rate, repeating that "nobody ever contacted me").

[57]Docket entry # 38, ¶ 6.1.

[58]U.S. Dep't of Tres., Office of Fin. Stability, Troubled Asset Relief Program: 3-Yr Anniversary Rep. 6 (Oct. 2011).

[59]A recent report and recommendation considering a similar claim provided the following description of the HAMP:

Under HAMP, the federal government incentivizes participating servicers

was created by the Emergency Economic Stabilization Act.[60]  The defendants asked for

summary judgment on this claim, arguing that Montalvo is not a consumer under the

DTPA.

The DTPA permits a Texas "consumer" to sue under its provisions.[61]

"'Consumer' means an individual…who seeks or acquires by purchase or lease, any

goods or services…."[62]  "'Goods' means tangible chattels or real property purchased or

leased for use."[63]  "'Services' means work, labor, or service purchased or leased for use,

---

[60]to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000 for each HAMP modification and up to $4,000 if the loan continues to perform. However, these incentives are countered by a number of financial factors that make it more profitable for a mortgage servicer…to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by a servicer….By allowing the loan to sit in default and accrue additional late fees and servicing penalties, [a servicer stands] to gain substantially more than if it were to accept the Federal government's incentives.

*Brandon v. Wells Fargo Bank*, No. 4:11–CV–261  2011 WL 6338832, at *1 (E.D. Tex. Nov. 30, 2011).

[60]U.S. Dep't of Tres., Office of Fin. Stability, Troubled Asset Relief Program: 2-Yr Retrospective 1 (Oct. 2010).

[61]Tex. Bus. & Comm. Code  § 17.50 (providing that a "consumer may maintain an action").

[62]Tex. Bus. & Comm. Code § 17.45(4).

[63]Tex. Bus. & Comm. Code § 17.45(1).

18

including services furnished in connection with the sale or repair of goods."[64]

Only "when a borrower's objective is to obtain goods or services and the loan provides the means for obtaining the goods or services, the borrower qualifies as a consumer."[65] A "person who seeks "only the extension of credit…and nothing more" is not a consumer under the DTPA because the lending of money is not a good or service."[66] Montalvo argued that a fact issue exists about whether she is a consumer,[67] but "[w]hether a plaintiff is a consumer under the DTPA is a question of law."[68]

Texas federal courts have recently addressed DTPA claims like Montalvo's claim and concluded that a person seeking a loan modification under the HAMP using a loan servicer is not a consumer under the DPTA.[69] Like the claims before those courts,

---

[64]Tex. Bus. & Comm. Code § 17.45(2).

[65]*Allen v. Am. Gen. Fin.*, 251 S.W.3d 676, 694 (Tex. App.—San Antonio 2007, rev. granted) (judgment vacated pursuant to settlement).

[66]*Allen*, 251 S.W.3d at 694. *See Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex.1980) ("[A] person whose objective is merely to borrow money is not a consumer because the lending of money does not involve either the purchase or lease of a good or service.").

[67]Docket entry # 59, ¶ 5.

[68]*Adams v. Bank of Am.*, No. 4:10–CV–709, 2011 WL 5080217, at *5 (E.D. Tex. Oct. 26, 2011).

[69]*See Pennington v. HSBC Bank USA, Nat'l Ass'n*, No. A–10–CA–785 LY, 2011 WL 6739609, at *7 (W.D. Tex. Dec. 22, 2011) (determining that as a matter of law, plaintiff-homeowners who relied on the bank's offer to determine whether the plaintiffs' "loans could be re-configured or worked out as required by the federal government pursuant

Montalvo's claim arose out of a loan, and does not involve the purchase or lease of either

---

to the HAMP program" were not consumers because "any services provided by Defendants were incidental to the contemplated loan modification; they were not an objective of the transaction"); *Brandon v. Wells Fargo Bank*, No. 4:11–CV–261, 2011 WL 6338832, at *9 (E.D. Tex. Nov. 30, 2011) (discussing why a plaintiff homeowner who participated in a mandatory HAMP modification trial period was not a consumer under the DTPA; the plaintiff's claim arose out of a loan and did not involve the purchase or lease of either goods or services; the plaintiff did not seek to purchase or lease any goods or services from the defendants); *Zoluaga v. BAC Home Loans Servicing*, No. 4:11–CV–369, 2011 WL 5600377, at *5 (E.D. Tex. Nov. 11, 2011) (explaining in a case where homeowners sued about an attempted loan modification that "a person whose objective is merely to borrow money is not a consumer because the lending of money does not involve either the purchase or lease of a good or service"); *Mustapha v. HSBC Bank USA*, No. 4:11–CV–0428, 2011 WL 5509464, at *5 (S.D. Tex. Nov. 10, 2011) (determining that the plaintiff-homeowners who alleged defendant-bank violated the DTPA by misrepresenting the nature of their services under the HAMP for loan modification were not consumers; the DTPA claim alleged that the plaintiffs sought to renegotiate a loan for their current house and thus failed to satisfy the requirements for consumer status under DTPA); *Manno v. BAC Home Loans Servicing*, No. A–11–CA–347 LY, 2011 WL 3844900, at *5 (W.D. Tex. Aug. 26, 2011) (explaining that because the plaintiff actually complained about the bank's failure to extend credit to him, the plaintiff was not a consumer; the claim was based on the bank's failure to re-negotiate the plaintiff's loan as allegedly promised). *See also Adams v. Bank of Am.*, No. 4:10–CV–709, 2011 WL 5080217, at *6 (E.D. Tex. Oct. 26, 2011) (explaining that the plaintiff-homeowner is not a consumer because "it is undisputed that Plaintiff's claims arise out of a loan and do not involve the purchase or lease of either goods or services"; "Plaintiff did not seek to purchase or lease any goods or services from Defendants."); *Jonas v. Ocwen Fin. Corp.*, No. H–10–243, 2011 WL 2960108, at *5 (S.D. Tex. July 20, 2011) (dismissing without legal analysis a plaintiff's DTPA complaint about the defendant loan-servicer's handling of loan application under the HAMP, but referring to the absence of standing to assert a DTPA claim); *Cavil v. Trendmaker Homes*, No. G-10-304, 2010 WL 5464238, at *4 (S.D. Tex. Dec. 29, 2010) (determining that homeowner who obtained a loan modification under the HAMP was not a consumer because "a mortgage or modification of a mortgage is not a good or a service under the DTPA"; the plaintiff alleged the defendant agreed to modify his loan a second time and protect his home from foreclosure, but foreclosed anyway).

goods or services. Montalvo did not seek to purchase or lease any goods or services from the defendants. Montalvo had already borrowed money to purchase a home. What she complained about was the defendants' failure to fulfill an agreement to help her obtain a loan modification under the HAMP.

To the extent the defendants made such an agreement, the defendants' offer of a trial payment plan "were ancillary services that served no purpose apart from facilitating a loan modification of an existing loan."[70] "[A]ny services provided by Defendants were incidental to the contemplated loan modification; they were not an objective of the transaction."[71] Accordingly, Montalvo is not a consumer under the DTPA. The defendants are entitled to summary judgment on the DTPA claim.

**Recommendation**. The oral agreements underlying Montalvo's breach-of-contract claim are barred by Texas's statute of frauds for loan agreements. No fact question exists about an exception to the statute of frauds. Therefore, the defendants are entitled to summary judgment on the breach-of-contract claim.

Montalvo is not a consumer under the Texas DTPA. Because she is not a consumer, Montalvo may not sue under the DTPA. Consequently, the defendants are entitled to summary judgment on the DPTA claims.

---

[70]*Pennington v. HSBC Bank USA, Nat'l Ass'n*, No. A–10–CA–785 LY, 2011 WL 6739609, at *7 (W.D. Tex. Dec. 22, 2011).

[71]*Pennington*, No. A–10–CA–785 LY, 2011 WL 6739609, at *7.

Montalvo conceded that no basis exists for an unreasonable-collection-efforts claim.  That claim is appropriately dismissed.

For these reasons, I recommend granting the defendants' summry-judgment motion (docket entry # 47) and entering summary judgment in favor of the defendants.

**Instructions for Service and Notice of Right to Object/Appeal**.  The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this report and recommendation must be filed within 14 days after being served with a copy of same, unless this time period is modified by the district court.[72]  Such party shall file the objections with the clerk of the court, and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo*

---

[72]28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

determination by the district court.[73]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.[74]

**SIGNED** on January 6, 2012.

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[73]*Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root*, 200 F.3d 335, 340 (5th Cir. 2000).

[74]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).