UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LISETTE MONTALVO, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No.  SA-10-CV-360-XR |
| | § | |
| BANK OF AMERICA CORPORATION, | § | |
| BANK OF AMERICA, N.A., | § | |
| | § | |
| *Defendants*. | § | |

**ORDER**

On this date, the Court considered the Magistrate Judge's Report and Recommendation issued January 6, 2012 (docket no. 88), and the objections thereto.  Therein, the Magistrate Judge recommends granting Defendants' Motion for Summary Judgment (docket no. 47).

**Factual Background**

In connection with the purchase of her home, Plaintiff Lisette Montalvo executed a Promissory Note, which was secured by a Deed of Trust, for $184,568 made payable to Countrywide KB Home Loans.  MERS was named as a beneficiary and nominee of the Lender (Countrywide).  In 2009, both the Note and Deed of Trust were assigned by MERS as nominee to Defendant BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing, LP ("BAC").

In the Summer of 2009, Montalvo began having trouble making payments.  Bank of America ("BoA"), on behalf of BAC,[1] sent a letter to Montalvo on July 6, 2009, stating that Plaintiff's loan

_____

[1] The letter notes that "BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A."  Docket no. 47, Ex. C-8.  It appears that Bank of America purchased Countrywide at some time before Plaintiff defaulted.

-1-

was "in serious default" because the May and June payments had not been made.  The letter informed Plaintiff of her right to cure the default by August 10, 2009, as well as other "options that may be available to you through BAC Home Loans Servicing, LP to prevent a foreclosure sale of your property," including repayment assistance, loan modification, sale of the property without foreclosure, or a deed-in-lieu of foreclosure.

Plaintiff alleges that she sought information from BAC, the loan servicer, regarding the loan, including what services BAC offered to persons having trouble making their mortgage payments. Plaintiff alleges that she had an absolute right under the Deed of Trust to cure any defaults, and had family resources available to do so.  BAC allegedly informed Plaintiff that it could give her the information she needed to cure any default on her existing loan, and could also provide other services relating to Plaintiff's eligibility to participate in the government's Making Home Affordable Program. Plaintiff alleges that when BoA accepted $25 billion from the United States Government related to its purchase of Countrywide, it entered into a Commitment to Purchase Financial Instruments and Servicer Participation Agreement for the Home Affordable Modification Program ("HAMP") sponsored by the Federal National Mortgage Association ("Fannie Mae").

Plaintiff alleges that on October 5, 2009, BAC represented to the Plaintiff's agents that Plaintiff would be eligible to participate in a trial loan modification offered by BoA under HAMP. BAC allegedly told Plaintiff that, instead of making her delinquent payments as she had the right to do under the Deed of Trust, she should use their services and participate in one of the many programs available to borrowers under government programs such as HAMP.  Plaintiff alleges that when she "offered to cure any delinquency in her mortgage during the pendency of the Defendant's preparation of the documents, ... her offer was refused" and she was "informed that the best avenue for her to

follow in order to qualify for the benefits of the various programs offered by the government, she should stay in default under the Note."

Plaintiff alleges that BAC represented to Plaintiff that she should make three consecutive monthly payments of $1,091.00, and in turn, the payments would and could postpone any pending foreclosure.[2] BAC allegedly told Plaintiff it would forward a written agreement placing the Plaintiff on a permanent loan modification upon verification of financial statements, which BAC would compile and send to the appropriate agency for processing. Plaintiff alleges and provides summary-judgment evidence that on October 6, 2009, the day after the agreement was made, she submitted a payment to BAC in the amount she was told. Plaintiff alleges that the events in October 2009 are just the first in a series of events where BAC knowingly induced Plaintiff to breach and/or forego her rights under the Note and Deed of Trust, which continued through the filing of the Complaint.

The Defendants' summary-judgment evidence indicates that Defendants, through counsel, served notice (by certified mail) to Montalvo on October 7, 2009 that the maturity of the Loan had been accelerated and that the property would be sold at a foreclosure sale on November 3, 2009. Docket no. 47, Ex. B-1. The notice provided that "[a]ll of the obligors and guarantors (if any) of the Debt have the right to reinstate the loan as provided in the Deed of Trust and as provided by applicable Texas law." *Id.*

Plaintiff's affidavit states that she contacted BoA on October 27, 2009, and that BoA personnel confirmed that a verbal trial payment plan was offered by a BoA representative on October 5, and that Plaintiff's payment of $1,091.00 was received in accordance with the agreement. The BoA

---

[2] Plaintiff's monthly payment of principal and interest under the mortgage was $1,290.53. Docket no. 47, Ex. C-3.

representative stated that nothing further needed to be done to prevent the foreclosure. Plaintiff states that she could have paid the arrearage at that time, but did not do so. However, on November 3, 2009, BAC foreclosed and purchased the home at a sheriff's sale. On November 20, 2009, BAC instituted eviction proceedings, but the proceeding were dismissed when Plaintiff's "lawyer got involved."

Plaintiff states that, after the foreclosure, she "once again sought the services of BOA to attempt to obtain relief under HAMP from the note holder." On February 2, 2010, Plaintiff entered into a "Negotiation Agreement" with BAC. Plaintiff alleges that BAC told her that it would help her obtain assistance and review under HAMP and sent her instructions on how to fill out the government forms that were necessary to qualify for one of the available government programs. Defendants allegedly agreed to prepare and present to a "designated agent" the appropriate information that would allow Plaintiff to obtain benefits under the appropriate government program, and that the services it provided would include advice regarding the manner in which Plaintiff should make her monthly payments to qualify for assistance under HAMP or other government programs. Plaintiff alleges that BAC advised Plaintiff of the necessary steps to take to qualify for HAMP assistance, which included more than loan modification. Plaintiff alleges that she understood that BAC would receive compensation for the services rendered to her by charging fees to her lender.

For reasons that are not apparent from the record, BAC agreed to set aside the foreclosure, and did so on February 25, 2010. The Rescission Deed states that BAC agreed to "rescind the acceleration of the indebtedness, reinstate the Note and Deed of Trust existing immediately prior to such foreclosure and conveyance, and return the parties to the status quo existing thereunder."

The summary-judgment evidence indicates that Defendants again served notice (by certified mail) to Montalvo on March 3, 2010 that the maturity of the Loan was accelerated and that the

property would be sold at a foreclosure sale on April 6, 2010.  Docket no. 47, Ex. B-2.  The notice provided that "[a]ll of the obligors and guarantors (if any) of the Debt have the right to reinstate the loan as provided in the Deed of Trust and as provided by applicable Texas law."  *Id.*

Plaintiff alleges that, since February 2010, she has attempted to determine her eligibility for HAMP or other programs for which BAC has represented that it would determine Plaintiff's eligibility.  BAC has informed Plaintiff that the workout assistance she sought was not an option (November 2009), that no information could be given without proper authorization (December 23, 2009), that BAC could not provide a response within the time frame originally quoted (March 4, 2010), that BAC was still in need of additional documentation to complete Plaintiff's loan modification review (October 4, 2010), and that the hardship letter could not be found (October 8, 2010). Plaintiff asserts she still has not been told that she does not qualify for HAMP, and that the most recent request by BAC regarding necessary documentation was at the end of November 2010. Plaintiff alleges that, despite representing that no foreclosure would be held during the loss mitigation eligibility review, and despite continuing such review from February through November 2010, BAC again accelerated the Note and posted the home for foreclosure in April 2010.  She further states that she has learned that she was denied a loan modification because she is more than twelve months delinquent, even though Defendants told her not to make the note payments so that she could qualify for a government loan modification.

### Procedural Background

Plaintiff commenced this lawsuit in state court on April 5, 2010 to prevent the scheduled

foreclosure.  Defendants timely removed the case on the basis of diversity jurisdiction.[3]  Plaintiff

asserts claims for breach of contract, unreasonable collection efforts, and DTPA violations.  On June

24, Defendants moved for summary judgment.  Defendants contend that: (1) Plaintiff's claims relying

upon an alleged oral agreement to modify the terms of her loan are barred by the Statute of Frauds,

and no exception applies; (2) the HUD regulations that Plaintiff claims were breached do not apply

to her loan[4]; (3) Plaintiff cannot maintain a DTPA claim because she is not a consumer; and (4) the

record refutes the allegation that Defendants engaged in unreasonable collection efforts.

On July 29, Plaintiff filed a Second Motion to Amend Complaint (docket no. 58) and a

response to the motion for summary judgment.  Acknowledging that the HUD regulations cited in the

complaint do not apply, Plaintiff sought to change the reference to the applicable HUD regulations

from 24 C.F.R. § 201.50 to 24 C.F.R. § 203.604.  The language of Paragraph 5.3 of the current

Complaint generally tracks the language of 24 C.F.R. § 201.50.  Thus, it is not the case that Plaintiff

included language from § 203.604 but erroneously included the wrong citation.[5]  Defendants opposed

---

[3] This Court has diversity jurisdiction, and claims against the Substitute Trustee have been dismissed.

[4] BAC pointed out that 24 C.F.R. § 201.50, the HUD regulation cited in the Amended Complaint, is located in the title governing "Title I Property Improvement and Manufactured Home Loans," and thus does not apply to Plaintiff's loan.

[5] The proposed Second Amended Complaint would state:

The Note states that BAC's ability to accelerate the terms of the Note are subject to the regulations issued by the Secretary of the Department of Housing and Urban Development. The regulations are found at 24 C.F.R. § 203.500, et seq, Subpart C—Servicing Responsibilities. Section 203.604, Contact with the Mortgagor, requires that BAC may only institute foreclosure proceedings in certain circumstances. In particular, BAC is required to contact the Plaintiff, either in a face-to-face meeting prior to accelerating the Note. If the Plaintiff had been allowed a face to face meeting with BoA, she presumably would have been correctly informed

the proposed amendment on the ground that it would be futile and because Plaintiff failed to satisfy the good cause standard of Rule 16. As discussed below, the Magistrate Judge denied the motion for leave to amend.

Plaintiff's response to the motion for summary judgment states that she "cannot dispute that one or the other of the Defendants are the owners of her Note and Deed of Trust." However, Plaintiff contends that (1) Defendants are estopped from asserting Plaintiff's default as a defense to her claim for breach of contract because Defendants induced her default; (2) the statute of frauds defense fails because HUD regulations, which are incorporated into the note, allow oral forbearance agreements, and thus oral modification of the time for payment is allowed by the terms of the contract; (3) Plaintiff may assert BOA's breach of the HUD regulations requiring a face-to-face meeting; (4) the following exceptions to the statute of frauds also apply: (i) oral extensions of time to make payments are outside the statute of frauds, (ii) partial performance; (5) material fact issues exist concerning Plaintiff's consumer status for DTPA purposes; and (6) fact issues exist as to her unreasonable collection efforts claim.

On August 19, Defendants filed a motion to strike Plaintiff's Summary Judgment Evidence (docket no. 62). Defendants complained that Montalvo's Affidavit contradicts her prior deposition testimony, and moved to strike specific statements from her Affidavit. Defendants also objected to the third page of the "Negotiation Agreement" attached as Exhibit B to Montalvo's Affidavit, asserting that the third page is fraudulent and not part of the Agreement. Defendants moved to strike the third page and statements in the Affidavit that rely on it. Last, Defendants objected to the affidavit

---

of what she needed to do and the acceleration and foreclosure could have been avoided. As a direct and proximate result of BAC's breach of the Note, the Plaintiff has suffered damages as set forth below.

of Gregory Rubiola as improper expert testimony.  On August 31, Defendants also filed a motion to exclude Plaintiff's Experts.

On October 10, the Court referred the pending motions to Magistrate Judge Nowak pursuant to Rule 72.  On December 13, she issued orders denying Plaintiff's Motion for Leave to Amend Complaint (docket no. 79), denying Defendants' Motion to Exclude Plaintiff's Expert Witnesses (docket no. 81), and denying Defendants' Motion to Strike Summary-Judgment Evidence (docket no. 82).  Defendants filed an objection to the denial of their motion to strike the summary-judgment evidence (docket no. 84).  On January 6, 2012, the Magistrate Judge issued her Report and Recommendation on Defendants' motion for summary judgment, in which she recommends that the motion be granted.  Plaintiff timely filed her objections on January 20.  And Defendants also timely filed their objection to the denial of their motion to exclude Plaintiff's experts (docket no. 91).  Defendants responded to Plaintiff's objections on January 31.  Plaintiff did not object to the denial of her motion for leave to amend.  Thus, all issues are ripe for disposition.

## Analysis

The Magistrate Judge recommends granting Defendants' Motion for Summary Judgment, which addresses the claims in Plaintiff's First Amended Complaint, including breach of contract, DTPA violations, and unreasonable collection efforts.  The Magistrate Judge found that Plaintiff effectively abandoned her unreasonable collection efforts claim and thus recommends summary judgment be granted on that claim.  On the breach of contract claim, the Magistrate Judge concluded that: (1) the claim based on an alleged agreement to modify the payment terms of the loan is barred by the statute of frauds for loan agreements; (2) the equitable estoppel exception to the statute of frauds does not apply; (3) an oral extension of time to make payments on the loan is also barred by

the statute of frauds; (4) the partial performance exception to the statute of frauds does not apply; (5) the claim based on insufficient notice of default and foreclosure fails as a matter of law; and (6) the claim based on violation of the HUD regulations fails as a matter of law because the regulation does not apply to Plaintiff's loan, and even considering the proper regulation, the summary-judgment evidence indicates that the regulation was not breached. The Magistrate Judge also found that Plaintiff's request to equitably enforce the agreement to modify the loan should be denied. Last, with regard to the DTPA claim, the Magistrate Judge concluded that Plaintiff was not a consumer for purposes of the DTPA.

Plaintiff filed objections, arguing that (1) Montalvo is a consumer for purposes of the DTPA claim, and fact issues preclude summary judgment on this claim; (2) the statute of frauds does not bar the breach-of-contract claim because (i) the doctrine of equitable estoppel precludes Defendants from asserting a breach based on Plaintiff's making payments in the amount they directed, (ii) the HUD regulations, which are incorporated into the Note, allow oral forebearance agreements, and (iii) the doctrine of partial performance is an applicable exception to the statute of frauds; and (3) a jury should decide whether Defendants' twice posting Plaintiff's home for foreclosure after telling her they would not is "willful and wanton" and thus amounts to unreasonable collection efforts.

**A. Whether Plaintiff is a DTPA consumer?**

The Magistrate Judge recommends granting summary judgment on the DTPA claim because the Plaintiff is not a consumer. The DTPA permits only a "consumer" to sue, and a consumer is one who seeks or acquires, by purchase or lease, goods or services. Tex. Bus. & Comm. Code § 17.45. Under Texas law, money (including loans) and intangibles are not "goods," and thus this case turns on whether Plaintiff sought "services" by purchase or lease. The Texas Supreme Court has defined

the term "services" as "action or use that furthers some end or purpose: conduct or performance that assists or benefits someone or something: deeds useful or instrumental toward some object." *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex. 1980).  In other words, "services" is "similar in nature to work or labor" and includes an activity on behalf of one party by another.  *Id.*

In *Riverside Bank v. Lewis*, the Texas Supreme Court held that seeking an extension of credit or borrowing money is not seeking a service under the DTPA.  And it also held that incidental services provided by a bank in the course of extending credit, such as "help in filling out [a] loan application, financial counseling, and the processing of [a] loan," were not DTPA services because (1) the plaintiff's goal was to obtain money (by refinancing his car loan), (2) the argument that services existed in the lending of money was not supported by the evidence but was merely hypothetical, and (3) the plaintiff made no complaint about the quality of the collateral activities that he claimed to be a service.  *Id.* at 175.

The Magistrate Judge cited to a number of federal court cases in which the courts have concluded that a person seeking a loan modification under HAMP using a loan servicer is not a DTPA consumer.  Plaintiff contends that the federal court cases cited by the Magistrate Judge do not address the type of evidence offered by Plaintiff, and that the Magistrate Judge failed to liberally construe the DTPA.  Plaintiff contends that it is the Plaintiff's *intent* in seeking to acquire services that determines consumer status, and that a loan transaction may include a DTPA "service" if the activity at issue is, from the plaintiff's point of view, an objective of the transaction, not merely incidental to it.  Plaintiff cites to *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 567 (Tex. 1984), in which the Texas Supreme Court held that a lender may be subject to a DTPA claim if the borrower's objective is the purchase or lease of a good or service, thereby qualifying the borrower as a consumer.

Plaintiff recognizes that courts have not necessarily agreed on when ancillary services are an "independent objective" as opposed to incidental to a loan. Plaintiff cites *Federal Deposit Insurance Corp. v. Munn*, 804 F.2d 860 (5th Cir. 1986), in which the Fifth Circuit noted that consumer status is ordinarily a question of law, but may be a fact question that must be submitted to the jury "if the existence of an agreement for services collateral to a credit extension is a 'basic ingredient' of DTPA consumer status" in the case. *Id.* at 863. The *Munn* court further discussed *Riverside Bank v. Lewis* and noted that "Texas courts have generally confined *Riverside*'s denial of consumer status to cases in which the loan is the sole basis of the complaint and was the plaintiff's central objective." *Id.* at 864.

The *Munn* court further discussed "three categories of cases involving intangibles, from which emerges the key principle to determining consumer status under the DTPA: the purchased goods or services must be an objective of the transaction, not merely incidental to it." *Id.* at 865. Thus, *Flenniken*, which involved mortgagor activities connected with the purchase of a home, represents the category of cases in which a loan is connected to the purchase of a good, which is the objective of the transaction, and thus the court finds as a matter of law that the plaintiff is a consumer. In contrast, *Riverside Bank* and *Ritenour* "reflect the tension in the statute when the objective of the transaction is the exchange of intangibles." *Riverside Bank* "represents the category of cases in which the court denies consumer status because the transaction's sole objective is the exchange of intangibles (present money for future money or money for stocks) and because the complaint's basis is the purchase of the intangible instead of any collateral services." *Ritenour* "represents the category of cases in which the court grants consumer status even though an important objective is the purchase of an intangible, for the service that forms the basis of the complaint is *also* an important objective

of the transaction and hence is a purchased 'service.'" *Id.* The distinction is a difficult one, as recognized in *Munn*: "Unfortunately, *Ritenour* does not clearly identify when an activity is an objective of a transaction that also involves an intangible and when the activity is merely incidental to the central objective of acquiring the intangible." *Id.*

The Magistrate Judge noted that Texas federal courts addressing DTPA claims like Montalvo's have concluded that a person seeking a loan modification under the HAMP using a loan servicer is not a consumer under the DTPA. MNR at 19 n.69 (listing cases). These cases generally view the facts as a straightforward application of *Riverside Bank v. Lewis* (although the Court notes that *Riverside Bank* did not foreclose a DTPA claim upon proper proof). Montalvo criticizes the Magistrate Judge for not considering cases from Texas state courts as opposed to federal courts, and emphasizes that "the services in this case are alleged to be performed by [BAC], who is not the lender, and who negotiates loan renewals between the customers whose loans it services, the Government, and borrowers like the Plaintiff." Pl. Obj. at 11.

By way of background, HAMP is a government program in which participating mortgage servicers determine whether mortgagors are eligible for permanent loan modification. Certain mortgage servicers (such as servicers of loans owned or guaranteed by Fannie Mae or Freddie Mac) are required to participate, and those who voluntarily participate enter into contracts with Fannie Mae as the Department of Treasury's agent, through which they agree to review potentially eligible homeowners who ask to be considered for HAMP and receive incentives in exchange.[6] In this case, the evidence shows that BAC was the mortgage servicer and thus was the entity responsible for determining whether Montalvo was eligible for HAMP.

---

[6] http://www.makinghomeaffordable.gov/about-mha/faqs/Pages/default.aspx

This Court considered the issue of DTPA consumer status in *Pagan-Negron v. Wells Fargo*, Civ. A. No. 11-CV-398, Docket no. 17 (W.D. Tex. Sept. 6, 2011). In *Pagan-Negron*, the plaintiff made allegations similar to those asserted by Montalvo in this case. Pagan-Negron argued that she was seeking a complete review of her loan modification applications with the objective of saving her home, and was thus seeking services and not merely an extension of credit. This Court reviewed certain Texas cases cited by the plaintiff, including *Herndon v. First National Bank of Tulia*, 802 S.W.2d 396 (Tex. App.–Amarillo 1991, writ denied), *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 536 (Tex. App.–Corpus Christi 1989, writ denied), *Juarez v. Bank of Austin*, 659 S.W.2d 139, 142 (Tex. App.–Austin 1983, writ ref'd n.r.e.), *Fortner v. Fannin Bank*, 634 S.W.2d 74, 75-76 (Tex. App.–Austin 1982, no writ), and *Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382, 389 (Tex. 1982), in which Texas courts had found the plaintiff to be a DTPA consumer.

Though these cases involved loans, the courts found that the plaintiffs sought services independent from the loan. In *Herndon,* it was purchased financial services ("financial advice on where and when to obtain financing, or abstain from borrowing and how to structure the various financial arrangements"). In *Rockport Rebel,* it was escrow services used in connection with a financed sale of real property. In *Juarez*, the plaintiff "specifically requested and was provided other 'services' including the credit insurance" that was the subject of the complaint. In *Fortner*, the bank allegedly agreed to process the title papers to Fortner's car, and that was the subject of the complaint. And in *Knight*, the plaintiff sought to purchase a truck via an extension of credit, and the Texas Supreme Court held that he was a consumer because he was purchasing a good (the truck) and the extension of credit was part of that transaction. In *Knight*, the Texas Supreme Court noted that *Riverside Bank* was nothing more than the plaintiff's attempt to obtain a loan to avoid repossession

of his car: "Other than Lewis' payment for the use of money, there was nothing else for which he paid, or which he sought to acquire." *Riverside*, supra at 173. The Texas Supreme Court further stated that, in *Riverside*, the plaintiff "approached Riverside Bank with one objective; he sought to acquire money. He attempted to obtain this money by promising to repay the indebtedness in the future with interest. Put simply, he sought to exchange future amounts of money for that amount which he desired to have in the present. There is no evidence that he sought to acquire anything other than this use of money."

In *Pagan-Negron*, this Court concluded that the facts were most analogous to *Riverside Bank* because the plaintiff had already obtained a home through a separate transaction, and the ultimate goal of the loan modification was a loan of money, though on different terms than the current mortgage. The Court reasoned that any review of her application would be incidental to obtaining the new loan and therefore not an independent service conferring consumer status.

Similarly, in *Maginn v. Norwest Mortgage, Inc.*, 919 S.W.2d 164, 166-67 (Tex. App.–Austin 1996, no writ), the Austin court of appeals held that plaintiffs who applied for a mortgage loan were not consumers with regard to the "ancillary banking services" of evaluating their credit history and assisting in the closing because the "end aim" of the dealings with Norwest was to obtain a mortgage loan and Norwest's ancillary services "served no purpose apart from facilitating a mortgage loan."

*Pagan-Negron* was decided on a motion to dismiss, however, and the plaintiff did not make the same allegations that Montalvo makes in this case.  In fact, Montalvo's complaint survived dismissal under Rule 12(c) on this basis because she expressly contended that she sought to and did acquire services from BAC/BoA, not a loan of money, and that she did not expect BAC to renegotiate the terms of the loan.  Rather, she alleged that she sought to acquire BAC's services to determine her

-14-

eligibility to participate in HAMP or other government programs because of BAC's professed special expertise and knowledge about how Plaintiff could qualify, that BAC agreed, in exchange for fees paid to it by BoA, to help Plaintiff prepare and present to a "designated agent" the appropriate information to allow Plaintiff to receive the most assistance, to compile documents that BAC represented to be necessary for Plaintiff to qualify, and to advise Plaintiff on what payments on the Note she should or should not make in order to qualify.

In conjunction with her summary-judgment evidence, Montalvo relies on *Herndon* and *Fortner* (discussed above) and additional Texas court cases to establish that she is a DTPA consumer. In *Western National Bank v. Conover*, Civ. A. No. 07-97-197, 1998 WL 270003 (Tex. App.–Amarillo 1998, no pet.), the court of appeals held that the plaintiffs were consumers because they purchased real estate, which was financed, and also because they purchased services in the form of the Bank's monitoring the construction progress and disbursement of funds to ensure that the plaintiffs were protected from potential losses because of excessive advances under the note.  Thus, when the plaintiffs financed the real estate with the bank, they intended both to build a house and to rely on the bank's monitoring service, and these monitoring services are not those normally incidental to an ordinary real estate mortgage loan.

In *Lubbock Mortgage & Investment Co. v. Thomas*, 626 S.W.2d 611, 613 (Tex. App.–El Paso 1981, no writ), the plaintiff sought to obtain a loan to purchase a laundromat, and worked with Lubbock Mortgage and Investment Company.  The district court found that Lubbock had publicly advertised the availability of loans and financing through its offices, that it represented to the plaintiff that loan services would be provided that were never provided, and that plaintiff, induced by statements and assurances by Lubbock's agents and employees, paid it for services for which he

received no benefit.  Plaintiff never obtained the loan, and Lubbock turned out to be a loan broker and not a lender.  The court of appeals held that, because Lubbock was a loan broker, "in consideration for the value it received [Lubbock] could and did offer only a 'service' as that term is used in *Riverside*."  *Id.* at 613.  Further, the plaintiff complained not only that he received no loan, but also that Lubbock had represented its services to have characteristics, uses, benefits and standards that it did not have, such that plaintiff's complaints were "directed to the quality of services he had paid for in connection with the extension of credit he sought."  *Id.*  The court emphasized that Lubbock itself "insisted throughout the trial that it was not a lender but had only its services as a loan broker to sell." *Id.*

In *Allen v. American General Finance, Inc.*, 251 S.W.3d 676, 694 (Tex. App.–San Antonio 2007, pet. granted and vacated pursuant to settlement) and *White v. Mellon Mortgage Co.*, 995 S.W.2d 795, 801 (Tex. App.–Tyler 1999, no pet.), the courts of appeals stated the proposition that when the borrower seeks services from the lender as an independent objective and not merely ancillary to a loan, the borrower is a consumer with respect to the provision of such services.  *Allen*, 251 S.W.3d at 694; *White*, 995 S.W.2d at 801.  Further, the courts stated that "[a]n activity related to a loan transaction is a 'service' for DTPA purposes only if the activity at issue is, from the plaintiff's point of view, an objective of the transaction, not merely incidental to it."  *White*, 995 S.W.2d at 801.  In *Allen*, the court held that the determining factor is whether the borrower's "objective" is solely to obtain a loan or to obtain a good or service.  Although Allen sought an extension of credit, the summary judgment evidence established that his objective in going to the defendant was to get a tax lawsuit taken care of, and defendant agreed "to take care of it" and undertook to loan Allen money and provide escrow services to accomplish this objective, thus

-16-

providing more than a scintilla of evidence that his primary objective was to obtain the services that formed the basis of his complaint.

In *White*, the court actually found that the plaintiff was not a consumer with regard to her complaint that she had been unnecessarily paying PMI premiums in connection with the purchase of real estate.  The court noted that "Mellon's collection of premium payments for MetLife, as required by the deed of trust, is not a service that White sought to purchase," that purchase of PMI was not her objective, and that she would have bypassed it if her mortgage lender had not required it as a condition of the loan.

Last, Montalvo cites *West v. State*, 212 S.W.3d 513, 518 (Tex. App.–Austin 2006, no pet.), in which the State sought a temporary injunction and asset freeze under the DTPA against a defendant advertising a debt elimination service for sale to consumers.  To establish that the defendant was violating the DTPA, the State argued that West was offering a loan forgiveness service, and the "banking opportunity" was not a loan because it specified that repayment was unnecessary.  The court of appeals noted that the service being offered was similar to the function of a credit services organization, which performs services such as improving a consumer's credit rating, obtaining an extension of consumer credit for a consumer, or providing advice or assistance with regard to either.[7]

Montalvo contends that "the services in this case are similar to the services offered in the *Lubbock* case, where a third party holds itself out as being able to obtain credit from a lender."  She

---

[7] Montalvo also cites *Farmers & Merchants State Bank v. Ferguson*, 605 S.W.2d 320, 324 (Tex. Civ. App.–Fort Worth 1980), although that case was modified on appeal, 617 S.W.2d 918 (Tex. 1981) because the plaintiff failed to prove that the banking services were for personal use as opposed to commercial use.  The facts of that case are also not on point, because the court of appeals held that the bank agreed to perform certain services – honoring checks drawn on plaintiff's account – and had the right to receive a service charge for the use of its services.

emphasizes "that BOA represented that it could provide the services necessary to obtain a loan modification from the government."  Montalvo contends that her specific evidence is key because consumer status depends on whether the services that the Plaintiff sought to acquire from BAC in obtaining a loan modification was an objective of (and not merely incidental to) the transaction, from Plaintiff's point of view.  Montalvo thus points to her affidavit, which states: (1) that BAC told her it could help her out with her current difficulties and help her do what was necessary to apply for government programs to get some relief under programs such as HAMP and HARP (Home Affordable Refinance Program), (2) that she did not seek to borrow money from BAC/BOA but sought to acquire the services of BAC to obtain help with the government programs, (3) that she told BAC she would like to use their services to help her qualify for a government program and they said they would help, (4) that she entered into a Negotiation Agreement and that BAC told her they would help her obtain assistance and review under HAMP and sent her instructions on how to fill out the government forms that BAC represented were necessary to qualify for the available government programs, (5) that BAC agreed to prepare and present to a Designated Agent the appropriate information that would allow her to obtain benefits under the appropriate government program, (6) that BAC represented that it would provide advice about what manner she should make monthly payments in order to qualify for assistance, that BAC did advise her of the necessary steps to qualify for assistance under HAMP, which included much more than just loan modification, and (7) that she understood that BAC would receive compensation for the services rendered to her by charging fees to the government.

Plaintiff also offers the affidavit of Gregory Rubiola, a licensed mortgage broker, who testified that he is familiar with the types of services that are usually offered to borrowers when they seek to

refinance their loans, and that the service provided by BAC is not a service usually incidental to a completed loan transaction. Rubiola states that services such as filling out and preparing government forms, putting them and required information together in a form required by a "designated agent" in such a manner as would allow a borrower to qualify for participating in a government program, and advising a customer in what manner to make monthly payments to qualify for assistance under HAMP or other available government programs are not usually provided in the furnishing of a Texas residential mortgage loan. Rather, he states, these are new services that have only arisen in the past few years since the government began its modification programs, and there is now quite a marketplace in firms that offer "for profit loan modification, mortgage refinance/origination and/or foreclosure rescue services." Rubiola states that there are companies that provide these services for a fee.

Plaintiff argues that this evidence is sufficient to raise a fact issue regarding whether Plaintiff had an objective independent of the loan and is thus a DTPA consumer. In contrast, Defendants contend that the Magistrate Judge correctly dismissed this claim as a matter of law. Defendants note that Plaintiff cites no case in which a plaintiff such as Montalvo was found to be a consumer, and that Plaintiff ignores the numerous cases holding to the contrary.

After carefully considering the case law and the summary-judgment evidence, the Court accepts the Magistrate Judge's recommendation to resolve this issue as a matter of law and to grant summary judgment in favor of Defendants on Plaintiff's DTPA claim. The claim need not be submitted to a jury because, even assuming all facts as alleged by Plaintiff to be true, Plaintiff fails to establish that she is a DTPA consumer.

Plaintiff seeks to divorce the services provided by BAC as the loan servicer participating in the government programs for homeowners from the ultimate loan modification. To the extent she

does so, Plaintiff's claim ultimately fails because, while there may be services involved and those services may have value, Plaintiff fails to provide any summary-judgment evidence that she sought to obtain such services *by purchase or lease*. There is no summary-judgment evidence that Plaintiff paid or sought to pay for the services offered by BAC. Rather, the only evidence is that Plaintiff understood that BAC would be compensated by the lender.[8] And though Plaintiff alleges that she "could have hired someone else to do this, as there are numerous web sites that offer to help borrowers get qualified to participate in a government program to help borrowers," the fact that other entities offer these services for a fee or that the services have commercial value does not render Plaintiff a consumer. *See Rayford v. Maseilli*, 73 S.W.3d 410 (Tex. App.–Houston [1st Dist.] 2002, no pet.) (party receiving gratuitous legal services is not a DTPA consumer).

The reality is that, under the facts of this case, the services provided by BAC cannot be divorced from the ultimate loan modification. Under HAMP, BAC's obligation as the mortgage servicer is to evaluate the Plaintiff to determine whether she is eligible for permanent loan modification and to take steps in furtherance of such evaluation and ultimate modification. The mortgage servicer is not a loan broker. Defendants' summary-judgment evidence establishes that "BAC does not offer advice, assistance, or counsel on loss mitigation options to borrowers whose loans are not being serviced by BAC and who are not seeking a loss mitigation alternative offered by BAC." Docket no. 46, Decl. of Casheena Chaney. In addition, as noted, after the assignment from MERS, BAC was both the loan servicer and the loan owner. Thus, to the extent BAC offered services

---

[8] Plaintiff's Complaint alleges that she "understood that BAC would receive compensation for the services rendered to her by charging fees to her lender," while her Affidavit states that she "understood that BOA would receive compensation for the services rendered to [her] by charging fees to the government." However, there is no evidence that Plaintiff herself would pay for any of the services either directly or indirectly as part of the entire transaction.

regarding modification of the note/loan, the services were offered only to determine whether Plaintiff would be eligible to modify the loan it owned, meaning that the services were incidental to a loan modification.  As such, BAC did not function like a broker or credit repair organization as alleged, since its services and agreements "served no purpose apart from facilitating a loan modification of an existing loan" that it held.  *See Maginn*, 919 S.W.2d at 167; *Pennington v. HSBC Bank USA*, Civ. A. No. A-10-CA-785-LY, 2011 WL 6739609 (W.D. Tex. Dec. 22, 2011).[9]

Accordingly, the Court accepts the recommendation to grant summary judgment on Plaintiff's DTPA claim because Plaintiff is not a consumer as a matter of law.

## B. Breach of Contract

Plaintiff's breach-of-contract claim contains a number of facets.  First, Paragraphs 5.1 and 5.2 allege that Defendants have breached the terms of the Note and Deed of Trust by declaring a default in payment when no default occurred, that BAC excused Plaintiff's non-compliance with the terms of the Note and Deed of Trust by instructing Plaintiff to make payments in the amount that it did, and that BAC is estopped from insisting that Plaintiff comply with the terms of the Note after it represented to Plaintiff that she make the payments as instructed, and Plaintiff relied on those instructions to her detriment.

Second, Paragraph 5. 3 alleges that BAC breached the terms of the Note by accelerating the Note without servicing the Loan with diligence, without using any prudent measures to induce the

---

[9] Though some government programs, such as Home Affordable Foreclosure Alternatives ("HAFA") may involve solutions other than loan modification (*e.g.*, HAMP) or refinancing (*e.g.*, HARP), Plaintiff does not complain about any services related to such other programs with any specificity.  Rather, her pleadings and evidence relate only to HAMP and HARP and her desire to remain in her home under the terms of a modified loan.  The Court makes no ruling as to whether complaints about such other types of programs like HAFA would render a plaintiff a consumer for DTPA purposes.

Plaintiff to bring the loan account current, and failing to discuss with Plaintiff the reason for default, in violation of HUD regulations incorporated into the Note.

Third, Paragraph 5.4 alleges that Plaintiff and Defendant entered into an oral contract to modify the terms of the Note and Deed of Trust on October 5, 2009, in which they agreed that if Plaintiff "made three payments of $1,091.00 and submitted the appropriate paperwork, BAC would induce BofA to modify the Loan in accordance with the terms and conditions of such modifications under HAMP." Plaintiff alleges that she fully performed the agreement, and Defendant partially performed the agreement, but breached the agreement by accelerating the Note and foreclosing on the Plaintiff's home. Plaintiff "seeks damages from BoA for breach of the oral agreement to modify the Loan in accordance with HAMP."

Last, Paragraph 5.5 "seeks specific performance of the terms of the Note and Deed of Trust, and requests the equitable intervention of this Court to order that both the Note and Deed of Trust be reinstated, and that BAC and BoA be ordered to continue to perform the terms of both the Note and Deed of Trust as agreed." Plaintiff further seeks to offset the principal amount due on the reinstated Note by the damages proximately caused by Defendant's breaches and other wrongful contract.

*Paragraph 5.3*

Paragraph 5.3 alleges that BAC breached the terms of the Note by accelerating the Note without servicing the Loan with diligence, without using any prudent measures to induce the Plaintiff to bring the loan account current, and failing to discuss with Plaintiff the reason for default, in violation of HUD regulations incorporated into the Note. As noted, in support of this claim, the Amended Complaint cites to inapplicable HUD regulations that Defendants allegedly violated, and the Magistrate Judge denied the motion for leave to amend to cite the correct regulations. That order

has not been objected to.

The Magistrate Judge concluded that, even considering the correct regulations, the claim that BAC was required to have a face-to-face meeting cannot survive summary judgment because the regulations contain an exception to the requirement if the mortgaged property is not within 200 miles of the mortgagee, its servicer, or a branch office of either.  The Magistrate Judge noted that Defendants presented summary-judgment evidence that the lender did not operate a servicing center within a 200-mile radius of the mortgaged property that was staffed with employees familiar with servicing issues, and thus the exception applies.

Plaintiff has filed no objections to the portion of the Magistrate Judge's order concerning this aspect of Plaintiff's claims.  The Court finds the recommendation to be neither clearly erroneous nor contrary to law, and accepts the recommendation to grant summary judgment on this claim.

*Paragraph 5.4*

Paragraph 5.4 alleges that Plaintiff and Defendants entered into an oral contract to modify the terms of the Note and Deed of Trust on October 5, 2009, in which they agreed that if Plaintiff "made three payments of $1,091.00 and submitted the appropriate paperwork, BAC would induce BoA to modify the Loan in accordance with the terms and conditions of such modifications under HAMP." Plaintiff alleges that she fully performed the agreement, and Defendants partially performed the agreement, but then breached the agreement by accelerating the Note and foreclosing on the Plaintiff's home.  Plaintiff "seeks damages from BoA for breach of the oral agreement to modify the Loan in accordance with HAMP."

The Magistrate Judge concluded that, because this allegation relied on an alleged oral agreement to modify the loan, the claim must satisfy the statute of frauds.  Texas has a special statute

of frauds for loan agreements that exceed $50,000.  Section 26.02 of the Texas Business & Commerce Code provides that "[a] loan agreement in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative."  Further, lenders are required to give notice to debtors that the "written loan agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties." *Id.* § 26.02(e).  The summary-judgment evidence demonstrates that this notice was provided to Plaintiff.  Docket no. 47, Ex. C-19.  Thus, the terms of Plaintiff's loan agreement may not be contradicted by subsequent oral agreements.

In addition, both Texas state and federal courts have concluded that, generally, both the original loan and any alleged agreement to modify the original loan are governed by section 26.02 and must be in writing.  *See, e.g.*, *Deuley v. Chase Home Finance, LLC*, Civ. A. No. H-05-04253, 2006 WL 1155230, at *2 (S.D. Tex. April 26, 2006).  Not every oral modification of the terms of a written contract falls within the statute of frauds.  *See Garcia v. Karam*, 276 S.W.2d 255 (Tex. 1955). Rather, the general rule is that an oral modification may be enforceable if it does not materially alter the obligations imposed by the original contract.  *Horner v. Bourland*, 724 F.2d 1142, 1148 (5th Cir. 1984).  An oral agreement to modify the percentage of interest to be paid, the amounts of installments, security rights, the terms of the remaining balance of the loan, the amount of monthly payments, the date of the first payment, and the amount to be paid monthly for taxes and insurance is an impermissible oral modification.  *Id.* (citing *Foster v. Mutual Savings Ass'n*, 602 S.W.2d 98 (Tex.Civ.App.–Fort Worth 1980, no writ)).

The *Deuley* court concluded that, although oral extensions of the time for performance are

often found to be outside the statute of frauds, where the plaintiffs allege that they applied for a specific program altering their obligations under the original loan and came to an oral agreement with the bank regarding this program, this is a material alteration of the underlying contract and thus subject to the statute of frauds. *Deuley*, 2006 WL 1155230 at *2. Further, to the extent plaintiffs contend that a new oral contract was created (as opposed to a modification of the original loan), such an oral contract would also be governed by the statute of frauds for loan agreements. *Id.* at *3.

The Magistrate Judge applied this reasoning and held that the alleged modification agreement (to make three monthly payments of $1,091 to avoid acceleration and foreclosure and to ultimately obtain a modification) was governed by the statute of frauds. She noted that there was no writing evidencing such an agreement, and thus enforcement of the agreement was barred by the statute of frauds.

With respect to alleged exceptions to the statute of frauds, she concluded that promissory or equitable estoppel does not overcome the statute of frauds defense. The Magistrate Judge followed Texas law, which holds that when a plaintiff attempts to enforce an oral agreement subject to the statute of frauds, for promissory estoppel to create an exception to the statute of frauds, there must have been a promise to sign a written agreement that had been prepared and would satisfy the statute of frauds. *See, e.g.*, *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 29 (Tex. App.–Houston [14th Dist.] 2005, pet. denied).[10]  The Magistrate Judge found that

---

[10] *See also* RESTATEMENT (SECOND) OF CONTRACTS § 139, Reporter's Note to comment b ("Other courts have permitted reliance to displace the requirement of a writing only in narrowly circumscribed situations, refusing to act unless there has been a misrepresentation that the Statute has been complied with or a failure to carry out a promise to make a memorandum of an oral agreement. The Texas Supreme Court enforced oral promises to avoid injustice in *"Moore" Burger, Inc. v. Phillips Petrol. Co.*, 492 S.W.2d 934 (Tex. 1972) and *Cooper Petrol. Co. v. LaGloria Oil & Gas Co.*, 436 S.W.2d 889 (Tex. 1969), but later cases have noted that those Texas Supreme Court

Plaintiff produced no such evidence, and thus promissory estoppel did not permit enforcement of the oral modification agreement that was governed by the statute of frauds.

With regard to partial performance as an exception to the statute of frauds, the Magistrate Judge noted that Texas courts have not clearly accepted partial performance as an exception to the statute of frauds in section 26.02.  But to the extent it could apply, the Magistrate Judge concluded that the evidence was insufficient to raise a fact issue because there is no evidence of virtual fraud, that Montalvo suffered substantial detriment for which she has no adequate remedy, and making payments in the amount of $1,091 is equally consistent with Montalvo's claims as with merely making partial payments due on her existing loan.

In her objections, Montalvo agrees that seeking to enforce an oral agreement to modify the original loan "may fall to the Statutory Statute of Frauds."  She thus accedes that she may not attempt to enforce such an oral agreement and she apparently no longer seeks to assert new contract rights under a modified loan agreement.  Pl. Obj. at 18.[11]  But, she contends, "[n]ot allowing BOA to enforce the contractual terms [of the original loan agreement] based on its inequitable conduct does not create a new agreement which would be barred by the Statutory Statute of Frauds."  *Id.*

In other words, Montalvo contends that she may estop BOA from insisting on its strict legal rights to accelerate and foreclose under the original Note and Deed of Trust when it would be unjust to do so.  This claim is asserted in paragraphs 5.1 and 5.2, and will be addressed in that section.

---

opinions emphasized broken promises to make subsequent writings . . . ."  (citations omitted).

[11]To the extent she is still arguing that the HUD regulations and partial performance allow her to enforce the oral agreement to modify the loan, the Court rejects those arguments.  The fact that HUD regulations allow specific oral forbearance agreements does not enable Plaintiff to enforce an oral agreement different from what the HUD regulations contemplate.  The Court further accepts the Magistrate Judge's conclusion that the partial performance exception is not satisfied.

The Magistrate Judge's recommendation to grant summary judgment on Plaintiff's claim related to breach and enforcement of an alleged oral agreement to modify the loan is accepted.

*Paragraphs 5.1 and 5.2*

Paragraphs 5.1 and 5.2 allege that Defendants have breached the terms of the Note and Deed of Trust by declaring a default in payment when no default occurred, that BAC excused Plaintiff's non-compliance with the terms of the Note and Deed of Trust by instructing Plaintiff to make payments in the amount that it did, and that BAC is estopped from insisting that Plaintiff comply with the terms of the Note after it represented to Plaintiff that she make the payments as instructed, and Plaintiff relied on those instructions to her detriment. Paragraph 5.2 also alleges that Defendants breached the Note and Deed of Trust by failing to give adequate notice to allow Plaintiff to exercise her right to cure any defaults prior to accelerating the balance due on the Note.

With regard to the notice claims, the Magistrate Judge observed that the summary-judgment evidence disproves these claims. Defendants provided Plaintiff with notice of default and the right to cure (on October 7, 2009 and March 3, 2010), and Plaintiff knew she had defaulted when she contacted BAC about modifying the loan.

The crux of this claim is that Defendants breached the Note and Deed of Trust by accelerating the note and foreclosing when they were estopped from doing so. The Magistrate Judge recognized that Plaintiff asserted that Defendants were estopped from seeking to take advantage of Plaintiff's default, "when it was their false promise that led to Plaintiff being in default." *See* docket no. 59 at 5. However, the Magistrate Judge viewed this claim as part of Plaintiff's claim to enforce the alleged oral modification, which is barred by the statute of frauds.

Plaintiff contends, however, that this aspect of her claim does not seek to enforce the oral

agreement to modify the loan.  Rather, Plaintiff asserts a more limited claim – that Defendants cannot

assert that Plaintiff is in default under the original loan because Defendants themselves induced the

default.  This estoppel argument is in the nature of waiver or excuse.  It is addressed by the

Restatement (Second) of Contracts § 150 comment b, which provides that

> Where a contract is modified by subsequent agreement and the contract as modified
> is within a provision of the Statute of Frauds, the modified contract is unenforceable
> unless the Statute is satisfied.  In such a case, if the original contract was enforceable
> it is not rescinded or modified but remains enforceable.  <u>But the unenforceable</u>
> <u>modification may operate as a waiver.  To the extent that the waiver is acted on before</u>
> <u>it is revoked, it excuses the other party from performance of his own duty and of</u>
> <u>conditions of the duty of the waiving party.</u>

(Emphasis added).  Thus, if a mortgagor changes her position and defaults in reliance on an oral

modification agreement, which is unenforceable under the statute of frauds, such that reinstatement

of the original terms of the loan would be unjust, the mortgagor's default  may be excused and the

mortgagee estopped from asserting its rights (such as acceleration and foreclosure) triggered by the

default.  Such a claim does not attempt to enforce the unenforceable oral agreement, but rather

excuses the mortgagor's default under the existing, enforceable loan agreement.

Texas courts do not appear to have considered, much less adopted, § 150 of the Restatement.

However, the Court concludes that the Texas Supreme Court might adopt such a rule.  *Cf. Haase v.*

*Glazner*, 62 S.W.3d 795 (Tex. 2001) (noting that the statute of frauds does not apply to a claim for

out-of-pocket damages caused by reliance, but rather only to a claim trying to enforce the benefit of

the bargain of an agreement subject to the statute of frauds).

Although Plaintiff's briefing implies that Plaintiff's default was caused by Defendants telling

her to make the payments of $1,091,[12] the undisputed evidence shows that Plaintiff was already in default before contacting BAC about modifying the loan.  Thus, this is not a case in which the mortgagor would not have defaulted but for being told by the mortgage servicer to make a lower payment than required by the Note under an unenforceable oral agreement.  In such a case, a mortgagor would have a strong argument that the mortgage servicer induced the default and thereby excused it or is otherwise estopped from relying on the default to accelerate the note and foreclose.

Comment d of § 150 recognizes that "[i]f the duty or condition would not have been performed in any event, or if there is a waiver of performance after a failure of performance, the failure is not in reliance on the modifying agreement."  Thus, where the mortgagor's default is not caused by reliance on the unenforceable modifying agreement, estoppel does not apply.

Plaintiff does allege, however, that she "offered to cure any delinquency in her mortgage, during the pendency of the Defendant's preparation of the documents, but her offer was refused." Am. Compl. ¶ 4.11.  She further alleges that she was told "she should stay in default under the Note" in order to qualify for the "various programs offered by the government."  *Id.*[13]  These allegations are supported by her Affidavit.  Thus, although Plaintiff was not induced to default, her argument is that she was induced into remaining in default and not exercising her right to cure the default by

---

[12] *See, e.g.*, Pl. Obj. at 3 "The conclusion in the Report that the Defendants can tell the Plaintiff what payments to make under the Note, and then find her in default when she does so, is incorrect as a matter of law for the following reasons . . . .  The doctrine of equitable estoppel precludes the Defendants from asserting a breach in making payments in the amount the Defendants told her to . . . ."; Pl. Obj. at 17 "The doctrine of Equitable Estoppel prohibits BOA from seeking to take advantage of the Plaintiff's default, when it was their false promise which led to the Plaintiff being in default."

[13] Homeowners do not need to be in default to be eligible for HAMP.  Rather, they are eligible if they reasonably believe they are very likely to default on their mortgage soon and can provide the necessary documentation.

Defendant's representations and agreements.

The Magistrate Judge did not consider this aspect of Plaintiff's claim, likely because Defendants characterized it as a claim that "an oral agreement existed between [Plaintiff] and BAC to modify her payment obligations under the Loan," which it asserts was an oral agreement barred by the Statute of Frauds.  Docket no. 47 at 6.  Defendants further contended that they did not breach the Deed of Trust by declaring Montalvo in default because she was, undisputably, in default and had not cured the default.  *Id.*  Defendants' motion does not address Plaintiff's argument that it waived the default or is estopped from asserting the default as a basis for acceleration.  Even in their response to Plaintiff's objections, Defendants continue to ignore any distinction between seeking to enforce an agreement barred by the statute of frauds and seeking to estop a party to an enforceable contract from asserting a breach.

Plaintiff was aware of her right to cure the default (she alleges that she offered to do so), and Defendants twice informed her of the right to cure the default.  Although she states that she had the resources to do so, there is no evidence that she in fact ever tendered the past due amounts to cure the default.  Thus, Plaintiff's claim turns on whether she was wrongfully induced by Defendants not to cure and, if so, whether that amounts to a waiver or estoppel of Defendants' right to foreclose.

Plaintiff's affidavit provides that she was able to cure the default, that she informed Defendants that she was able to make up the past unpaid payments if she should, but that Defendants told her not do to do so.  As a result of Plaintiff's not curing the default, BAC foreclosed in November 2009.[14]  Though this foreclosure was set aside, Plaintiff did incur costs associated with the

---

[14] The foreclosure appears to be a violation of HAMP procedures, since lenders are not permitted to foreclosure during the loan modification process, and Plaintiff's evidence shows that she was in compliance with her obligations for the loan modification process at the time BAC

foreclosure, and argues that she lost the right to qualify for HAMP or possibly other loan modifications as a result of Defendant's wrongful conduct.

Because Defendants did not expressly move for summary judgment on this claim, it remains pending. Defendant may file an additional motion for summary judgment on this claim within twenty-one days of this Order. The motion should address both the factual and legal basis for Plaintiff's claim, and should address both whether Defendants were in breach by accelerating and foreclosing in November 2009 (and any damages flowing therefrom) and whether Defendants were in breach by accelerating and giving notice of intended foreclosure in March 2010. If Defendant does not file such a motion, the Court may order briefing *sua sponte*.

Insofar as Defendants argue that they provided adequate notice and that actual enforcement of an oral modification agreement is barred by the statute of frauds, summary judgment is granted.

*Paragraph 5.5*

Paragraph 5.5 "seeks specific performance of the terms of the Note and Deed of Trust, and requests the equitable intervention of this Court to order that both the Note and Deed of Trust be reinstated, and that BAC and BoA be ordered to continue to perform the terms of both the Note and Deed of Trust as agreed." Plaintiff further seeks to offset the principal amount due on the reinstated Note by the damages proximately caused by Defendant's breaches and other wrongful conduct. Insofar as this claim depends on Plaintiff's estoppel claim, it also remains pending.

**C. Unreasonable Collection Efforts**

The Magistrate Judge concluded that Montalvo presented no evidence raising a fact question

---

foreclosed. Plaintiff cannot assert a private right of action under HAMP, but it appears relevant to whether Plaintiff reasonably relied on Defendants' representations that she need not cure the default and that no foreclosure would occur during the HAMP process.

about whether the Defendants' conduct was willful and wanton and "effectively abandoned her unreasonable-collection-efforts claim."

Unreasonable collection efforts is an intentional tort that lacks clearly defined elements. *B.F. Jackson, Inc. v. Costar Realty*, 2009 WL 1812922, at *5 (S.D. Tex. 2009). "Unreasonable debt collection efforts are defined as efforts that amount to a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish or bodily harm." *Baker v. Countrywide Home Loans*, Civ. A. No. 3:08-CV-916, 2009 WL 1810336, at *7 (N.D. Tex. June 24, 2009). The case law varies on the degree of conduct necessary to give rise to an actionable claim. *Id.* at *8. Though Plaintiff alleges facts showing that Defendants may have violated HAMP and may have been negligent, the Court agrees that summary judgment on this claim is proper and accepts the recommendation on the basis that Plaintiff fails to show a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish. The elements of harassment and malicious intent are necessary to differentiate this claim from negligence or breach of contract. *See Watson v. Citimortgage, Inc.*, 4:10-CV-707, 2012 WL 381205, at *7 (E.D. Tex. Feb. 3, 2012); *Narvaez v. Wilshire Credit Corp.*, 757 F. Supp. 2d 621, 635-36 (N.D. Tex. 2010) ("evidence of negligence is insufficient to support a cause of action for unreasonable collection efforts"). Plaintiff has not shown that Defendants attempted to collect a debt that had been fully paid, intentionally violated HAMP, intentionally lied or deceived her into remaining in default, intentionally foreclosed while knowing they had no legal right to do so, or the like, and thus summary judgment is proper.

## Conclusion

The Court ACCEPTS the Magistrate Judge's recommendation to grant Defendants' Motion for Summary Judgment (docket no. 47) so far as it goes. Thus, summary judgment is granted on

Plaintiff's DTPA and unreasonable collection efforts, and certain aspects of Plaintiff's breach of contract claims.  With regard to the remaining breach of contract claims, Defendant may file an additional motion for summary judgment for the Court's consideration within twenty-one days of this Order.

It is so ORDERED.

SIGNED this 30th day of March, 2012.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE